5 A.3d 695

**BALTIMORE STREET PARKING COMPANY, LLC**

v.

**MAYOR & CITY COUNCIL OF BALTIMORE, et al.**

Nos. 279, 667 Sept. Term, 2009.

Court of Special Appeals of Maryland.

Sept. 15, 2010.

**570**

572

M. Albert Figinski (Joshua L. Caplan, Law Offices of Peter G. Angelos, PC, on the brief) Baltimore, MD, for appellant.

Sandra R. Gutman (George A. Nilson, City Solicitor, on the brief) Baltimore, MD, for appellee.

Panel: EYLER, JAMES R., MATRICCIANI and ALAN
M. WILNER (Retired, Specially assigned), JJ.

EYLER, JAMES R., J.

This Court has before it two consolidated matters—a peti-
tion for judicial review and a declaratory judgment action. On
March 11, 2008, the Baltimore City Commission for Historical
and Architectural Preservation (CHAP), appellee in both mat-
ters, held a hearing to consider whether the structure known
as the Pennsylvania Railroad Building, located at 200 East
Baltimore Street ("the structure"), should be placed on the
Landmark List and/or the Special List of structures having
historical or architectural significance. The structure is
owned by Baltimore Street Parking Company, LLC,[1] appel-
lant. At the March 11, 2008 hearing, CHAP voted to place the
structure on the Special List and the Landmark List. Appel-
lant filed a petition for judicial review of CHAP's determina-
tion in the Circuit Court for Baltimore City. Subsequently,
appellant withdrew its request for review of the Landmark
List determination on the ground that such review was prema-
ture. Appellant continued to seek review of the Special List
determination, and on February 20, 2009, the circuit court
affirmed CHAP's decision to place the structure on the Special
List. Appellant appealed to this Court.

On September 18, 2008, appellant filed a complaint for
declaratory judgment in the Circuit Court for Baltimore City
in which it named CHAP and the Mayor and City Council of
Baltimore ("the City"), appellees,[2] as parties. On May 18,
2009, the court dismissed appellant's complaint for declaratory
judgment, and appellant appealed to this Court.

Perceiving no error, we affirm.

---

1. It is unclear from the briefs of the parties, but it appears that Edison
Properties, LLC is an affiliate of appellant.

2. While CHAP is an appellee in both actions, the City is an appellee in
the declaratory judgment action only. For ease of reference, we will
refer to CHAP as "CHAP" when referring to the petition for judicial
review action and will refer to CHAP and the City as "appellees" when
referring to the declaratory judgment action.

## Questions Presented

On appeal, appellant presents two issues for our review, as phrased by us:

I. Whether CHAP violated appellant's due process rights by denying appellant notice and a meaningful opportunity to be heard before placing the structure on the Special List.

II. Whether appellant was properly afforded judicial review by way of administrative mandamus or, if not, whether appellant must be afforded judicial review pursuant to Maryland Code (2006 Repl.Vol.), § 3–401, et. seq. of the Courts & Judicial Proceedings Article ("CJP"), the Declaratory Judgment Act.

## Procedural and Factual Background

In the late 1990's, appellant began acquiring properties in the area in which the structure is located and entered into discussions with City agencies with respect to development of the area. Several buildings were demolished with appropriate approvals and a surface parking lot was built. The structure in question was not demolished. In a letter dated October 9, 2002, Laurie Schwartz, then Deputy Mayor of the City, wrote to appellant stating that, among other things, the City did not support demolition of the property, but "would be more inclined to support demolition of [the property] when the request is made within the context of a significant redevelopment project and it can be shown that preserving the building is neither feasible nor desirable."

The next events relevant to this appeal occurred in 2008, but before reviewing them, we pause to briefly outline the applicable legislative enactments. The General Assembly, to "preserve structures and landmarks of historic and architectural value," authorized the City to "enact laws for historic and landmark zoning and preservation." Maryland Code (2003 Repl.Vol.), Article 66B, § 2.12. Pursuant to that authority, Article 6, subtitle 3 of the Baltimore City Code sets forth the process for designating Preservation Districts, Landmark Lists, and Special Lists. On the recommendation of the City

Planning Commission, CHAP may propose the designation of a Preservation District or designate a structure for the Landmark List, but both require City Council approval. Art. 6, §§ 3–1 and 3–2. CHAP may place a structure on the Special List without further approvals. Art. 6, § 3–3. A structure in a Preservation District or on the Landmark List may not be substantially altered without approval of CHAP, after conducting a public hearing on the request to alter. Art. 6, § 4–1 to 4–6. In contrast, with respect to a request to alter a structure on the Special List, CHAP may cause the issuance of a permit to perform the alteration to be delayed for up to six months. Art. 6, § 4–7.

By notice dated December 26, 2007, CHAP advised appellant that it would hold a public hearing on January 8, 2008, to consider placing the structure on the Landmark List and Special List.

At the January 8, 2008 hearing, appellant requested that it be postponed. Fred Shoken,[3] CHAP's staff presenter, related facts relevant to the structure's historical, architectural and cultural significance. Alfred Barry III, an employee of AB Associates and a representative of appellant, stated that appellant was given late notice and had insufficient time to prepare for the hearing. Appellant stated that it had "no plans to demolish this building. We haven't applied for any permits." CHAP granted the continuance and stated that it would "have public testimony at the future consideration."

On February 6, 2008,[4] counsel for appellant sent a letter to the Baltimore City Planning Department ("the Planning Department") and to Baltimore Development Corporation ("BDC"), referencing a meeting held on February 5 or 6

---

**3.** Mr. Shoken's name appears in different forms in the record. For consistency and because the parties use this form in their briefs, we will use the name "Shoken."

**4.** The letter is dated both February 6, 2008 and February 5, 2008. Appellant's counsel referenced "February 6th" at the March 11, 2008 hearing, but in its brief, appellant stated the meeting was on February 5. For ease of reference, we will refer to the date as February 6, 2008.

regarding the structure and "summarizing the history of [their] existing agreement" in order to "better formalize that agreement and obviate any reason for CHAP designation of [the property]." The letter outlined the history of appellant's acquisition of the property, which included that appellant acquired the property "in July of 1998 following an earlier purchase that year of the Tower Building parking lot.... Both acquisitions were part of a planned long-term acquisition of the entire block for future redevelopment."

The letter noted that the Urban Renewal Plan ("URP"), approved in May of 2001, included acquisition authority for three Baltimore properties for demolition, but "notably", the structure was not included on the URP's Notable Properties List.[5] The author of the letter expressed the view that the URP and the design review process should control the redevelopment of the area and that "CHAP designation of the building would create a bifurcated authority, with different bodies having jurisdiction over portions of the larger site that would potentially be conflicting and would significantly impede the redevelopment process for the site." The letter proposed to "draft and enter into a formal agreement with your Departments that would ensure that this analysis relating to the building be accomplished as part of the City's review of the development plans for the site ..., with the understanding that the proposed CHAP designation be withdrawn in connection with the execution of such more formal agreement." Appellant noted that it "hopes to reach an agreement in principal [sic] before the next scheduled CHAP hearing on March 11th." Based on our review of the transcript of the March 11, 2008 hearing, it appears that Kathleen Kotarba, CHAP's executive director, Mr. Shoken, and representatives of BDC, the Planning Department, and Downtown Partnership of Baltimore attended the meeting held on February 5 or 6.

---

5. "Notable Properties" were those deemed of "significant importance to the overall well-being and quality of the City," that their preservation and use should be encouraged.

On February 22, 2008, Mr. Barry, on behalf of appellant, wrote a letter to the Planning Department enclosing an "initial draft agreement [they] discussed" relating to the structure. The letter reflected copies to BDC, CHAP, and Downtown Partnership. The draft agreement provided, among other things, that appellant would not demolish the structure, and the Special List and Landmark List designations by CHAP would be withdrawn. The draft agreement contained signature lines for the Planning Department, BDC, the City, and CHAP. The author stated that he would "appreciate confirmation that [appellant] does not have to prepare for the March 11th CHAP hearing" and that the hearing would be continued "pending resolution of this alternative." The requested confirmation did not occur.

On February 28, 2008, CHAP sent a formal notice to appellant, advising that it would hold a public hearing on March 11, 2008, "to consider Baltimore City Landmark and Special List designation of [the property]."

At the March 11, 2008 hearing, Mr. Shoken made a presentation as to the location of the structure, the designation of other buildings in the area, and the history of the structure. Mr. Shoken advised that the structure was built after the Baltimore Fire and showed a photograph from a newspaper in 1905, showing the ground floor of the structure. Mr. Shoken advised that the property was included in a 2001 "HABS survey" [6] entitled, "Ten Enduring Landmarks of Baltimore's Central Business District." Mr. Shoken stated that "one of the things that [is] unique about this building . . . is [that it is] only one of two buildings surviving on this block" and that "by retaining these buildings, you retain that history and the historical remembrance of what's there. . . ." Mr. Shoken concluded that "in applying the [CHAP] criteria, the building meets those standards of number one, four and five."

After Mr. Shoken presented the facts supporting the designation of the property, the chairman and presiding commis-

---

6. HABS is the acronym for Historic American Buildings Survey.

sioner stated they were "moving on to representatives from [appellant]." Appellant had four representatives at the hearing, namely, Albert Figinski, appellant's counsel, Victoria Morrison, appellant's executive vice president and general counsel, Mr. Barry, and Mark Gellman, an employee of Edison Properties, LLC. The following ensued at the hearing, in pertinent part.

APPELLANT'S COUNSEL: I'm here because we have asked for a postponement of this hearing.

* * *

What you are going to do today to this property amounts to a temporary or permanent injunction.

I[n] the law, those attempting to get a temporary or permanent injunction need to show some irreparable harm or some balance of convenience.

And I suggest to you that the record demonstrated by the documents which I have asked to be placed in the record do not demonstrate either irreparable harm or a balance of convenience for the designation.

* * *

On February 13th, Mr. Barry wrote to the Commission thanking them for their postponement of the January hearing.

In January you postponed the hearing because of insufficient notice given to us in December.

We stated in that letter what we would do would be to meet with members of this group, as well as other representatives of the City and come up with some kind of agreement that would protect any conceivable City interest, at the same time not placing what I consider to be a temporary or permanent injunction upon this property.

On February 22nd, Mr. Barry wrote to [the Planning Department], telling [it] that here's an initial draft of an agreement.

* * *

On February 6th, there was a meeting, I believe you had representatives there, representatives from BDC were there, the Director of the Planning Commission was there, and other members of the City superstructure were there. And a draft agreement was produced. That draft agreement I suspect is part of your record.

It is at least four pages in length. Now, this is draft. This is not a flaming arrow. This is a beginning of discussion. But what I am suspecting by the motions that may follow, is that you wish to cut off those discussions.

That would be a tragedy. It would be a tragedy for the process, and it would be a tragedy for the future.

It would be a tragedy because the agreement suggests that we will work with this group, as well as other groups, to come up with an appropriate plan for the entire site. This is not done in a vacuum.

* * *

MR. BARRY: [I]t really speaks to the heart of whether or not the City of Baltimore wants to enter into transparent and good faith negotiations with the developer, a substantial developer, and have those agreements undermined by actions by this body.

And I think we left that meeting on February 6 with members of your staff, Mr. Shoken was there, feeling that we were going to submit an agreement, it was going to be reviewed by the City.

And if . . . anybody had issues with it, we would have the opportunity to respond. And your action today is premature, and it's unnecessary and you ought to postpone it. But to speak to the agreement and [appellant]'s history of this going back to the [T]ower [B]uilding demolition, the adjacent building demolition, the creation by City Council of a parking lot, the acquisition ultimately in 1998 by [appellant] of that parking lot, and the beginnings of discussions with the City over that entire block.

That began in 1998, ten years ago. And during that time, we went back to the City Council, we went back and got

approval to tear the other buildings down. And you'll hear from Mr. Gellman [regarding the] specific agreement with the City relating to this building.

Now, I think it is notable, and I use that term deliberately, that at that same time the City was redoing its [URP] for the central business district. And it was a two year process by the [P]lanning [D]epartment and BDC. CHAP was very much involved in that, Preservation Maryland was very much involved in that. . . .

This building . . . was never included on the notable list. CHAP gave a list to the City. It was never part of the draft ordinances. It was never approved by the City Council. And I think that's important in that [appellant] goes into buying these properties saying . . . it can't be that important, if it's not part of the overall process that took two years to complete, number one.

Secondly, BDC and [the] Planning [Department] proposed buying this building along with the three adjacent buildings on Baltimore Street that Mr. Shoken talked about and showed you some pictures of, and proposed to tear those down for . . . open space, as part of the [URP].

They wanted to buy those buildings and designate it for open space. When [appellant] was approached about that, we owned the building, we said, if you're going to buy those buildings for open space, you obviously want to do it as part of an overall development plan for the whole block.

We are in the process of negotiating for all of those. You don't need to buy our building. Whatever you do for the other buildings, we have and we began, as you'll hear from Mr. Gellman, a discussion with the City that we were going to buy the whole block.

We had every intention of buying it. And . . . we had every approval from the City to tear those buildings down, with one exception, and the one exception was the corner building before you today.

\* \* \*

This building, if it's designated, is the tail wagging the dog. Because you should not have a bifurcated process that says this building has designation, the rest of the block has another design approval under the renewal plan.

* * *

[I]f you don't postpone it ... [it] is a bad faith effort in terms of how to treat a substantial developer for the site.

* * *

MR. GELLMAN: First came across the property in 1997, when the original—configuration of the parking lot was for sale.

* * *

When we went under contract for the parking lot ... I did my due diligence for the property. I met with City officials, I met with the Mayor's office, [BDC], the Downtown Partnership.

And what I learned ... was that it was the City's interest to demolish all of the buildings right up to Calvert Street.

* * *

So we purchased the parking lot—we actually closed on the parking lot in March of 1998. We closed on [the structure] in July of 1998. I immediately began negotiating for the other properties.

But we got full encouragement and support from the City, from the Mayor's Office, by BDC, from Downtown Partnership, to try to acquire all of the properties so there could be an integrated development on this site.

* * *

We began negotiations with the other owners, and it took several years until we acquired the other three properties. And the City which supported us to buy all of the properties, and were talking about demolition, now asked us, could we leave [the structure] up. . . .

The answer we got was that they didn't want the parking all the way out to Calvert Street, because the parking was going to be a temporary use, which is what parking is.

\* \* \*

I agreed with the Mayor's office, that we would not seek any demolition plans or permits for [the structure]. That we would only demolish the other three buildings. We would expand the parking lot, and it didn't seem like an unreasonable thing for us to agree to, considering that the reason was that they didn't want this parking lot all the way up to Calvert Street.

We agreed to that, after discussions. We had a written agreement to that.

\* \* \*

[M]aybe I should have had a more formal agreement than just between us and the Mayor's office, but it was an agreement, until recently when we were approached by this organization to want to designate this building.

\* \* \*

MS. MORRISON: [W]e have submitted a draft agreement to the City to make more formal our long standing agreement with the city regarding the site.

\* \* \*

Let me walk you through the draft agreement....

\* \* \*

It says any time that we are prepared to pursue a specific redevelopment plan, an architectural and economic feasibility analysis of incorporating this property into the overall development for the entire site will be prepared by us for the City's review.

The City, through [the Planning Department] and BDC will review the plans, under all of the applicable criteria.

CHAP and its staff will have full access to the submitted material for their review, and prepare recommendations to [the Planning Department] on the redevelopment plans and the alternatives.

Under the terms of the 2003 City Council approval, [the Planning Department's] design approval shall be required for the redevelopment plans. We will not apply for any

demolition or alteration permit until such time as final design approval has been obtained from [the] Planning [Department]. We'll maintain it in a clean and secure condition to prevent further deterioration. And that the special list and landmark designations by CHAP will be withdrawn and this procedure used in place.

\* \* \*

We voluntarily agreed with the City a number of years ago not to demolish this building. . . .

\* \* \*

Yet placing us on the special list abrogates that agreement with the City, and would impose an entire overlay of vague burdens that would disturb the integrated process that we have already begun.

\* \* \*

The special list and landmark designations . . . would separate this little piece from the entire site, and it would represent an ad hoc attempt at achieving protection against midnight demolition that's already in place.

\* \* \*

CHAIRMAN: [W]e have two actions before us, special list and landmark designation . . . [O]ur focus charge is whether or not this meets the criteria and we should consider these documents.

[Appellant's draft agreement was distributed to the parties and representatives.]

\* \* \*

APPELLANT'S COUNSEL: What this document does . . . [is] demonstrates a pattern of negotiation.

\* \* \*

[CHAP is] an independent agency. No one is trying to ram anything down your throat. However, I would suggest to you that our initial request is that this be postponed.

\* \* \*

[I]f you don't postpone it . . . I want you to know that we object to that, because we haven't really had an opportunity to adequately prepare an assault on this designation.

\* \* \*

[T]he Pennsylvania Railroad and the Baltimore & Ohio Railroad at the time of the Baltimore City fire were in conspiracy to come up with a monopolistic control of the railroads.

They plotted to have the B & O build a big building and the Pennsylvania interest, although it would be dominant, to be a little building.

\* \* \*

Now, I suggest to you it's not something you want to historically designate.

\* \* \*

CHAIRMAN: Obviously we need to consider what they're presenting and the legal aspects of it, but our true role today is applying the criteria for special list and landmark designation.

[Appellant], I'm going to give you one more opportunity to speak and we need to move on.

\* \* \*

APPELLANT'S COUNSEL: My summary is as follows: There's no impending need for this designation. The draft agreement is not final. It is a draft. [T]his company has worked with the City to try to come up with a plan for an integrated site.

We believe that you should postpone this vote. And I urge you to do that.

\* \* \* .

CHAP COMMISSIONER: What period of time are you requesting for a postponement?

\* \* \*

APPELLANT'S COUNSEL: . . . [A]t least 60 days.

John McClay from Baltimore Heritage testified that the structure "was placed on the Baltimore Heritage Preservation

watch list in 2003, one of the original buildings on that list."
Mr. McClay spoke about how the property had been publicized
in Style Magazine, the Daily Record, the Baltimore Sun, and
was featured in the Baltimore Heritage's newsletter, "Historic
Buildings We Should Save." Mr. McClay testified that "[w]e
believe that corner buildings are very important in providing
historical context."

Kirby Fowler from the Downtown Partnership of Baltimore
testified that "[t]his historic building should be part of the
texture of a more modern block."

Mr. Fowler also stated the following.

[Appellant] ... came in and met with the City. I was there,
[Ms.] Kotarba, [Mr.] Shoken and others, to discuss what
next steps to take.

And we thought it was a very positive discussion. And as a
result of that, the agreement was that [appellant] would go
back and produce an agreement that might actually result in
the preservation of the building for now.

[Appellant] did so, February 29th ... is when the draft
agreement was sent to everyone.

* * *

No one from the City got back to [appellant] about it. . . .

* * *

I think there ought to be a good faith approach to some-
thing like this. It's incumbent on all of us to try to
negotiate an agreement.

* * *

I think in the end of it we can't reach some agreement with
[appellant], I say let's landmark this property, let's do it.
But I think it's not—we have not been acting in good faith if
we never even responded to the draft agreement.

* * *

Following that testimony, the following occurred.

CHAIRMAN: We have two considerations in front of us.
One is for special list designation, the other is for Baltimore
City landmark designation.

We've heard the testimony from the owners, and others. We have two agreements that have been referred to. You've been given a copy of the letter agreement from October 9th, 2002 between [appellant] and Laurie Schwartz. And I think each of you have been given a copy of the proposed agreement ... referenced throughout this testimony.

\* \* \*

We're not here to debate the terms of those agreements. Our charge is to consider it for special list and landmark designation.

Is there any further—are there any further questions or comments from the Commission?

CHAP Commissioners raised issues regarding appellant's analogy to an injunction, as well as the effect of the Special List designation, after which Mr. Barry stated the following.

[W]e left that meeting with [the] Planning [Department], BDC and CHAP thinking that this was not going to be an adversarial hearing, if a hearing at all.

\* \* \*

So nothing can happen between now and then, because it's already notified on the special list.

\* \* \*

If we had time following that [January] hearing, we would have prepared to come in with an argument perhaps as to why this does not meet your criteria.

CHAP voted six to five to deny appellant's request for a postponement. CHAP then voted unanimously to place the structure on the Special List and the Landmark List. On March 31, 2008, CHAP mailed appellant a letter, stating that at the March 11, 2008 hearing, "the Commissioners considered the staff report and all testimony presented" and "approved the Special List designation and Baltimore City Landmark." The letter listed the ways in which the property met the CHAP designation standards.

On April 10, 2008, pursuant to Maryland Rule 7–202, appellant filed a petition for judicial review in circuit court. On May 16, 2008, CHAP filed a response to appellant's petition for judicial review and a motion to dismiss. CHAP argued that judicial review of a decision to place a property on the Landmark and Special Lists was not authorized by statute, that the Landmark designation of the property was not ripe for review, and that the court did not have jurisdiction.

On June 3, 2008, appellant filed a response to CHAP's motion to dismiss, with a memorandum of points and authorities and a request for a hearing. Appellant argued that there was "inherent judicial power to support judicial review, as well as capacity for review by administrative mandamus," pursuant to [*Reese v. Dep't of Health & Mental Hygiene*, 177 Md.App. 102, 144 n. 21, 934 A.2d 1009 (2007) ] and Maryland Rules 7–401, *et seq.* Appellant also stated that "[t]he City correctly states that the process for Landmark List designation needed further City action and is not reviewable now on ripeness grounds."

On June 19, 2008, appellant filed a memorandum in support of its petition for judicial review. In appellant's memorandum, the questions presented were: 1) whether CHAP's Special List designation on March 11, 2008 was impervious to judicial review and 2) whether appellant was provided sufficient notice and opportunity to be heard at the March 11, 2008 hearing to satisfy due process. Among other things, appellant argued that the "Special List designation is not just for a 'six month period . . . .' Rather, its six month injunction activates when a demolition or alteration permit is requested." Appellant argued that "[t]he "brand" of the Special List is . . . timeless and limitless and enjoins planning for redevelopment." Appellant maintained that Article 66B of the Baltimore City Code ("Art. 66B") authorizes landmark zoning, but does not authorize "a 'Special List' which brands a property and controls it upon 'posting.'" Also on June 19, 2008, appellant filed an amended petition for judicial review, noting that it was requesting review of the Special List designation only.

On July 11, 2008, the circuit court denied CHAP's motion to dismiss appellant's petition for judicial review, without prejudice. On September 18, 2008, CHAP filed a renewed motion to dismiss appellant's petition for judicial review, pursuant to Maryland Rule 7–204(b). In addition to what CHAP argued in its May 16, 2008 motion, it argued that administrative mandamus did not apply to this case because appellants did not timely file their appeal, pursuant to Maryland Rule 7–402.

On October 10, 2008, appellant filed a response to CHAP's renewed motion to dismiss. Appellant argued, among other things, that administrative mandamus is applicable to this case because appellant "complied with the substance of [Maryland] Rule 7–401, *et seq.*" and that CHAP received timely notice of appellant's request for judicial review.

On November 5, 2008, the circuit court held a hearing on appellant's petition for judicial review and CHAP's renewed motion to dismiss appellant's petition. On February 20, 2009, the circuit court issued an order and memorandum opinion, affirming CHAP's decision to place the property on the Special List. In addressing the issue as to whether the circuit court had authority to review the decision of CHAP, the court stated the following.

> Maryland common law recognizes three types of mandamus actions: traditional mandamus, mandamus in aid of appellate jurisdiction and administrative mandamus. Administrative mandamus is applicable in this situation.
> * * *
> While technically, [appellant] requested review pursuant to [Maryland] Rule 7–201, given the nearly identical framework, method of proceeding, and timeliness of [appellant's] appeal and Memorandum, this Court believes it is appropriate to convert the basis for the appeal to [Maryland] Rule 7–401 *et seq.*
> * * *
> Jurisdictions other than the City are mandated to permit appeals in historical landmark matters pursuant to . . . Art. 66B § 8.15.

\* \* \*

Baltimore is not bound by the Statute.

\* \* \*

The ordinance in the Baltimore City Code restricting judicial review of Special List designation erects a legislative classification that is unique to Baltimore City. This classification endows county residents with an opportunity for judicial review of certain zoning decision[s] which are denied to Baltimore City residents. This is a violation of equal protection. For these reasons, this Court holds that [appellant] can appeal CHAP's decision to put [the property] on the Special Designation List and denies [appellees'] Renewed Motion to Dismiss.

In addressing whether there was "substantial evidence in the record before CHAP to support its decision to place [the property] on the Special List," the court found:

CHAP accommodated [appellant's] request to postpone the decision at the January meeting. The Commissioners considered and rejected a second request for continuance. [Appellant] was put on notice at the January meeting that CHAP intended to consider Special List designation for the property on March 11, 2008 despite negotiations with other City agencies. Often negotiations continue until "trial[.]" [Appellant] had ample notice and opportunity to prepare for the March meeting.

\* \* \*

CHAP, after hearing testimony from all interested parties, voted to place [the property] on the Special List designation. It did so after consideration of [appellant's] counsel and witnesses, who attended the meeting. Counsel for [appellant] was invited to rebut any of the testimony supporting the designation. At no time, was a request made to cross-examine witnesses or were any witnesses denied the right to address the Commissioners. The testimony included a history of the building, expert testimony and testimony from the staff. Deference must be given to CHAP's fact-finding and decision making. Its decision was not premised

on an erroneous conclusion of law. Further, there is sufficient evidence in the record for a reasoning mind to reach the same factual conclusion CHAP did.

For the reasons indicated, this Court affirms the decision of [CHAP] to place [the property] on Baltimore City's Special List Designation.

On March 2, 2009, appellant filed a motion for reconsideration of the circuit court's February 20, 2009 order. On March 24, 2009, the circuit court denied appellant's motion for reconsideration.

On April 22, 2009, appellant noted an appeal to this Court.

On September 18, 2008, appellant filed a complaint for declaratory judgment in circuit court, pursuant to CJP § 3–401, et seq. Appellant's complaint asked for "an interpretation or invalidation of the 'Special List' designation imposed by [CHAP]. . . ." Appellant filed the complaint because CHAP "stated its intentions to renew [its] Motion to Dismiss [the petition for judicial review]. If [CHAP] is correct that judicial review under Title 7 of the Maryland Rules . . . is unavailable to [appellant], the 'Special List' designation is unconstitutional because it imposes a burden on the property without judicial review."

On March 11, 2009, appellees filed a motion for summary judgment, arguing that, in accordance with the February 20, 2009 order issued by the circuit court, there was no genuine dispute of material fact. Appellees argued, among other things, that because appellant "brought its claims by way of an appeal of a decision of CHAP under rules 7–202 and 7–402 governing appeals from administrative agencies, and where those rules constitute a special form of remedy governing such appeals, relief under the Declaratory Judgment Act [is] unavailable." Appellees argued that "this court's findings in the administrative appeal [have] finalized all disputes as to any material facts raised by [appellant] and as a result[,] [appellees] are entitled to judgment as a matter of law."

On May 18, 2009, the circuit court held a hearing on appellees' motion for summary judgment and granted it. The

court held that appellant cannot "circumvent the special statutory remedy which the Court has found is the appropriate way to proceed by bringing the Declaratory Judgment action, pursuant to [CJP § 3–409(b) ]."

On May 28, 2009, appellant noted an appeal to this Court.

On July 16, 2009, appellant filed a motion to consolidate the two appeals. On July 17, 2009, this Court ordered that the two cases be consolidated.

We shall incorporate additional facts as necessary in our discussion.

## Discussion

### Standard of Review

"The basis for judicial review of a decision by a local administrative or legislative body acting in an adjudicatory or quasi-judicial capacity may be (1) a statute or (2) common law or an equity writ (mandamus, injunction, certiorari, or declaratory judgment)." *Armstrong v. Mayor of Baltimore*, 169 Md.App. 655, 666, 906 A.2d 415 (2006) (quoting *Criminal Injuries Comp. Bd. v. Gould*, 273 Md. 486, 500, 331 A.2d 55 (1975)). In reviewing the decision of an administrative agency, "we reevaluate the decision of the agency, not the decision of the lower court." *Pickert v. Md. Bd. of Physicians*, 180 Md.App. 490, 499, 951 A.2d 904 (2008) (internal quotation omitted).

On appeal, we cannot substitute our "judgment for the expertise of those persons who constitute the administrative agency." *United Parcel Serv. v. People's Counsel*, 336 Md. 569, 576–77, 650 A.2d 226 (1994). Upon review, "an administrative agency's interpretation and application of the statute which the agency administers should ordinarily be given considerable weight by reviewing courts." *Md. Aviation Admin. v. Noland*, 386 Md. 556, 572, 873 A.2d 1145 (2005) (citing *Lussier v. Md. Racing Commission*, 343 Md. 681, 696–697, 684 A.2d 804 (1996)). "Even with regard to some legal issues, a degree of deference should often be accorded the

position of the administrative agency." *Noland,* 386 Md. at 572, 873 A.2d 1145 (2005).

For reasons discussed below, we shall not address the merits of the declaratory judgment action.

## Due Process

Preliminarily, we note the following. Baltimore City Code Art. 6, § 3–3(a)(1) and (a)(2) ("Art. 6") provide that CHAP "shall compile and maintain a [Special List] .... that [CHAP] considers to be of such historical or architectural importance ... that these ... structures should be extended the secondary protections of § 4–7 ... of this article." Art. 6, § 3–3(b)(2) states that the procedure to adopt a Special List includes that CHAP must "cause a conspicuous sign to be posted on each structure proposed to be placed on a Special List, giving notice" of a public hearing on whether the structure should appear on the Special List and the time and place of the hearing. Art. 6, § 3–3(b)(3) states that "public hearing shall be held no sooner than 10 days nor later than 20 days from the time the sign is posted."

Appellant contends that it was denied due process in that it was not afforded adequate notice and an opportunity to be heard. Appellant makes three arguments in support of that contention. In each argument, appellant asserts that designation on the Special List does not meet the due process safeguards provided by *Penn Cent. Transp. Co. v. New York City,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). First, appellant argues that it was denied meaningful notice of the March 11, 2008 hearing and that at the March 11, 2008 hearing, it was denied the opportunity to be heard. Second, appellant argues that CHAP's Special List designation indefinitely burdens the property because "no guidance for administrative review and postponement can extend beyond six months." Third, appellant argues that Art. 66B authorizes "landmark" zoning but not "Special List" zoning and that the Special List designation is inconsistent with the URP because the property is not listed as one of the URP's Notable Properties.

The *Penn Central* Court held that a New York City law which preserved historic landmarks and historic districts by placing restrictions on the development of individual historic landmarks did not constitute a "taking" requiring a payment of "just compensation," pursuant to the Fifth and Fourteenth Amendments. *Penn Central*, 438 U.S. at 107, 136, 138, 98 S.Ct. 2646. Appellant identifies five "explicit" safeguards approved in *Penn Central:* (1) the importance of "preservation of buildings and areas with historic or aesthetic importance," *Penn Central*, 438 U.S. at 107, 98 S.Ct. 2646; (2) the importance of a State enabling act, *Id.* at 108–109, 98 S.Ct. 2646; (3) giving all interested parties an opportunity to be heard, *Id.* at 110–111, 98 S.Ct. 2646; (4) consideration of a master plan, *Id.* at 111, 98 S.Ct. 2646; and (5) the ability of the owner to seek judicial review of the final designation decision. *Id.* Appellant argues that "at least four of the five safeguards are foreign to the Special List practice," thus supporting its contention that it must be afforded sufficient notice and opportunity to be heard.

### Proceedings at March 11 Hearing

■ Appellant explains that it was provided insufficient notice because "CHAP provided [a]ppellant with only ten days' notice of the March 11, 2008" hearing and, consequently, appellant "had insufficient time to produce the expert testimony needed to deflect any purported evidence of historic and architectural significance." Appellant contends that this time period was insufficient because the parties were in the midst of negotiations and "it did not expect an adversarial hearing." Appellant further contends that it was not provided sufficient opportunity for cross-examination at the March 11, 2008 hearing.

■ The failure of an administrative official or board to give a proper notice of a hearing, required by law, prevents the official or board from conducting a valid hearing. *Cassidy v. County Board of Appeals*, 218 Md. 418, 421–22, 146 A.2d 896 (1958). The essence of due process is the requirement that the party be given "notice of the case against him and

opportunity to meet it." *Mathews v. Eldridge,* 424 U.S. 319, 348–49, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (citation omitted); *See also Pitsenberger v. Pitsenberger,* 287 Md. 20, 30, 410 A.2d 1052 (1980) (internal citations omitted) ("At a minimum, due process requires that a deprivation of property be preceded by notice and opportunity for hearing appropriate to the nature of the case").

> [T]he heart of the requirement of notification in administrative proceedings [is that] the noticee should be apprised clearly of the character of the action proposed and enough of the basis upon which it rests to enable him intelligently to prepare for the hearing. If this minimum requirement is met, the notification is adequate, no matter how much it may fall short of the standards of pleading in judicial contests.

*O'Donnell v. Basslers, Inc.,* 56 Md.App. 507, 519, 468 A.2d 383 (1983) (quoting *Cassidy,* 218 Md. at 424, 146 A.2d 896).

 Due process requires the opportunity to be heard "at a meaningful time and in a meaningful manner." *Mathews,* 424 U.S. at 333, 96 S.Ct. 893 (quoting *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965)). "All that is necessary is that the procedures be tailored, in light of the decision to be made, to the capacities and circumstances of those who are to be heard ... to insure that they are given a meaningful opportunity to present their case." *Mathews,* 424 U.S. at 349, 96 S.Ct. 893 (internal citations omitted).

On December 16, 2007, appellant received its first notice scheduling a hearing with respect to the Special List designation. CHAP held the hearing more than 10 days later, on January 8, 2008. *See* Art. 6, § 3–3(b)(3). At the January 8, 2008 hearing, after CHAP presented evidence of the property's historical, architectural and cultural significance, appellant requested a postponement of the hearing and was granted it. The date of the continued hearing was not stated on the record at the January hearing. CHAP's chairman did state that "it would have public testimony at the future consider-

ation." Therefore, at the January 8, 2008 hearing, appellant was aware that CHAP intended to hold a hearing in the future. By the time of the February 6, 2008 letter, it was on notice of the March 11, 2008 hearing date.

Between the January 8, 2008 hearing and the March 11, 2008 hearing, at least some of the interested entities engaged in negotiations, which included a letter written by appellant's representative on February 22, 2008, that stated appellant would "appreciate confirmation that [it] does not have to prepare for the March 11th CHAP hearing" and that the hearing would be continued "pending resolution of this alternative." Appellant never received such confirmation. On February 28, 2008, CHAP sent a formal notice to appellant, advising that CHAP would hold the public hearing on March 11, 2008. *See* Art. 6, § 3–3(b)(3).

At the March 11, 2008 hearing, appellant had four representatives present, none of whom presented any evidence that appellant did not receive "notice of the case against [it]." *See Mathews*, 424 U.S. at 348–49, 96 S.Ct. 893. Appellant and its representatives provided information about the history of appellant's acquisition of the property, the ongoing negotiations between the parties, and the initial draft agreement written by appellant. One of appellant's representatives stated that appellant was under the impression it was going to submit an agreement and if "anybody had issues with it, [appellant] would have the opportunity to respond." Counsel for appellant reiterated that the draft agreement "demonstrates a pattern of negotiation" and that if CHAP did not postpone the hearing, appellant objects on the basis that it had not "really had an opportunity to adequately prepare an assault on this designation." Additionally, appellant's counsel stated that the structure was part of a "conspiracy" between The Pennsylvania Railroad and the Baltimore & Ohio Railroad and suggested that the structure is "not something you want to historically designate."

When CHAP asked appellant to summarize its argument, appellant stated that "[t]here's no impending need for this

designation. The draft agreement is not final. It is a draft. [T]his company has worked with the City to try to come up with a plan for an integrated site," and that appellant believed CHAP should postpone the hearing. Further, appellant claimed that "[i]f [it] had time following that [January] hearing, [it] would have prepared to come in with an argument perhaps as to why this does not meet your criteria."

While appellant asserts that it was "assured there would be no CHAP hearing as long as negotiations continued," there are no evidentiary materials in the record to support the assertion. Similarly, there is no evidence that appellant was not "apprised clearly of the character of the action proposed and enough of the basis upon which it rests to enable [it] intelligently to prepare for the hearing." *See Cassidy*, 218 Md. at 424, 146 A.2d 896. Appellant was given the opportunity to present evidence and to cross-examine the persons who testified on the merits of the proposed designations but did not do so. Accordingly, appellant was "given a meaningful opportunity to present [its] case." *Mathews*, 424 U.S. at 349, 96 S.Ct. 893.

### Indefinite Burden

Appellant argues that once a property is designated for the Special List, "CHAP enjoys limitless discretion to postpone the issuance of any permits each and every time a property owner applies for a permit." Art. 6, § 4–7. Appellant observes that "CHAP has no published standards for processing permit applications for properties on the Special List" and thus, "no guidance for administrative review and postponement can extend beyond six months." Appellant concludes that the Special List imposes a "limitless restraint" and "makes essential, for due process, a post-constraint hearing that fulfills procedural due process, not afforded at the March 11, 2008 CHAP hearing."

CHAP contends that appellant's "indefinite burden" contention was not raised before CHAP and thus, is not preserved for judicial review.

██ We note that a party "may not obtain judicial review of a matter when he or she failed to properly raise the matter before the administrative agency." *Heft v. Maryland Racing Com.,* 323 Md. 257, 273–74, 592 A.2d 1110 (1991). Appellant does not make this argument as a stand alone argument, however. As it did in circuit court, appellant observes that the asserted defects are a reason why there was a need for a meaningful hearing on March 11, which appellant asserts it did not receive. As we have already stated, we conclude that appellant was not unlawfully denied a meaningful opportunity to be heard.

Moreover, we see no constitutional violation on the face of the ordinance in question. Art. 6, § 3–3(a)(1) and (a)(2) provide that CHAP "shall compile and maintain a [Special List] .... that [CHAP] considers to be of such historical or architectural importance ... that these ... structures should be extended the secondary protections of § 4–7 ... of this article." Art. 6, § 3–3(c) provides that from the time notice is posted until CHAP makes its final determination as to the designation of the structure, the structure "is subject to the requirements and procedures of Subtitle 4." CHAP must hold a public hearing not sooner than 10 days nor later than 20 days from the time the sign was posted. Art. 6, § 3–3(b).

Art. 6, § 4–1(a) and (b) provide that when a structure is placed on the Special List, changes may not be made to the structure without first obtaining a permit from the Department of Housing and Community Development ("DHCD"). Art. 6, § 4–2(a) provides that, upon receipt of an application for a permit, DHCD must forward the plans to CHAP within 5 days of receipt of the application. Art. 6, § 4–2(c) provides that DHCD may not issue a permit for changes to or demolition of the structure until CHAP authorizes it or "proceeds as provided in this article."

Art. 6, § 4–3 provides that if CHAP does not authorize the issuance of a permit, it shall schedule a hearing "no sooner than 10 days nor later than 20 days" after notice is given. Art. 6, § 4–4(a) provides that CHAP must determine whether

to issue the permit within 15 days of the hearing and must consider certain factors set forth in Art. 6, § 4–4(b). Art. 6, § 4–7(b) provides that if CHAP decides to deny issuance of the permit, it must notify DHCD to postpone issuance of the permit for up to six months.

CHAP placed the structure in question on the Special List and provided notice of a hearing to appellant. Appellant has not applied to DHCD for a permit to make changes or demolish the property. However, even if appellant did apply for a permit and CHAP refused to approve it, appellant would be entitled to another hearing. If unsuccessful at that hearing, the effect would be to delay the issuance of a permit for up to six months. CHAP does not enjoy "limitless discretion," and the ordinance provides opportunities for the structure owner to provide input.

### Inconsistency with enabling act and URP

Appellant contends that the Special List provisions are inconsistent with Art. 66B, § 2.12, which expressly authorizes "landmark" zoning, but does not expressly authorize "Special List" zoning. Further, appellant contends that the Special List designation is inconsistent with the City's URP because the structure is not listed as one of the URP's Notable Properties. Appellant contends that the Special List designation "imposes burdens unmentioned in the urban renewal ordinance." Again, as was true of the last argument, appellant makes the argument to emphasize the importance of receiving a meaningful hearing. We address it in that context.

Art. 66B, § 2.12, entitled "Historic and landmark zoning and preservation," provides that, "[t]o preserve structures and landmarks of historic and architectural value as a public purpose of the State, the Mayor and City Council of Baltimore City may enact laws for historic and landmark zoning and preservation." Art. 66B, § 2.12 was enacted "[f]or the purpose of preserving structures and landmarks of historic and architectural value as a public purpose in this State." 2000 Md. Laws 426.

Pursuant to Art. 6, § 3–3, CHAP is empowered to maintain a Special List that CHAP "considers to be of such historical or architectural importance . . . that these . . . structures should be extended the secondary protections. . . ." Given that the purpose of Art. 66B, § 2.12 was to "preserv[e] structures . . . of historic and architectural value," the Special List designation meets that purpose and is encompassed within Art. 66B, § 2.12.

The Baltimore City Code, Art. 13, § 2.5(b)(1) ("Art. 13") defines a "Renewal Plan" as a plan "for the elimination, correction, or the prevention of the development or the spread of slums, blight, or deterioration in an entire Renewal Area or a portion thereof." *120 W. Fayette St., LLLP v. Mayor of Baltimore*, 407 Md. 253, 258 n. 1, 964 A.2d 662 (2009). In the URP for the Central Business District, Baltimore City Ordinance No. 01–170, there are 39 "Notable Properties" listed, of which the "preservation, maintenance, improvement, and continued use . . . are deemed significant to the overall well-being and quality of the City." The URP lists five development standards for Notable Properties, providing specific criteria where demolition of a Notable Property is allowed, as well as procedures for obtaining a permit to demolish a Notable Property, including the requirement of "public notice of the proposed demolition for a period of 12 months." Baltimore City Ordinance No. 01–170.

As stated, a structure on the Special List is afforded preservation protections as a result of being identified as historically or architecturally important. Art. 6, § 3–3. The goal is the same, but the protections of the Special List are more limited and exist for a limited period of time. *See* Art. 6, § 4–7(b) (if CHAP decides to deny issuance of a permit, it may cause delay in issuance up to six months). We perceive no actionable inconsistency. Without commenting on the merits, this and the preceding argument may be more properly addressed to a designation of a structure on the Landmark List.

*Judicial Review*

The parties agree that appellant was properly afforded judicial review pursuant to administrative mandamus, Maryland Rule 7–401 (governs actions for judicial review of a quasi-judicial order or action of an administrative agency). Appellant does not claim that it was entitled to a declaratory judgment, as distinguished from judicial review. Appellant argues that if this Court decides that appellant should not be afforded judicial review by way of administrative mandamus, appellant should be afforded the ability to pursue a declaratory judgment action.

Art. 66B, § 8.15 provides that "[a]ny person aggrieved by a decision of a historic district commission or historic preservation commission may appeal the decision in the manner provided for an appeal from the decision of the zoning board or commission of the local jurisdiction." However, Art. 66B, § 2.13 states, in pertinent part, that "§§ 3.01 through 8.15 of this article do not apply in Baltimore City." The circuit court concluded that, while appellant filed its petition pursuant to Maryland Rule 7–201, it could proceed pursuant to Maryland Rule 7–401. We agree with the circuit court, and appellant was properly afforded judicial review.

*Substantial Evidence*

Appellant does not directly raise the question whether CHAP's decision was supported by substantial evidence. When a court reviews the decision of an administrative agency, it must apply the "substantial evidence test" to determine "whether a reasoning mind reasonably could have reached the factual conclusion the agency reached." *Bulluck v. Pelham Wood Apartments,* 283 Md. 505, 512, 390 A.2d 1119 (1978). In reviewing an administrative agency's decision, "courts will act where a decision is not supported by facts, or where an action is not within the scope of delegated authority, or is arbitrary, capricious or unreasonable." *Baltimore Import Car Service & Storage, Inc. v. Maryland Port Authority,* 258 Md. 335, 342, 265 A.2d 866 (1970).

The evidence presented at the March 11, 2008 hearing by CHAP's staff presenter and other persons regarding the location of the property, the designation of other buildings in that area, and the history of the property was sufficient to meet the substantial evidence test. Given appellant's meager response as to why the structure should not be on the Special List and the evidence as to its architectural and historical significance, a reasoning mind could have reached the same factual conclusion as CHAP. *See Bulluck,* 283 Md. at 512, 390 A.2d 1119.

**JUDGMENTS AFFIRMED. COSTS TO BE PAID BY APPELLANT.**